Slip Op. 14-138

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| APEX FROZEN FOODS PRIVATE LTD., et al., | Before: Richard W. Goldberg, Senior Judge |
| Plaintiffs, | Court No. 13-00283 |
| v. | **PUBLIC VERSION** |
| UNITED STATES, |  |
| Defendant, |  |
| and |  |
| AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, |  |
| Defendant-Intervenors. |  |

## <u>OPINION</u>

[Sustaining the final results of an administrative review of an antidumping duty order on certain frozen warmwater shrimp from India.]

Dated:  December 1, 2014

*Robert L. LaFrankie*, Hughes Hubbard & Reed LLP, of Washington, DC, argued for plaintiffs.  With him on the brief was *Matthew R. Nicely*.

*Joshua E. Kurland*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director.  Of counsel on the brief was *Scott D. McBride*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

*Jordan C. Kahn*, Picard Kentz & Rowe LLP, of Washington, DC, argued for defendant-intervenor Ad Hoc Shrimp Trade Action Committee.  With him on the brief were *Andrew W. Kentz*, *David A. Yocis*, and *Nathaniel Maandig Rickard*.

*Elizabeth J. Drake*, Stewart and Stewart, of Washington, DC, argued for defendant-intervenor American Shrimp Processors Association.  With her on the brief were *Terence P. Stewart* and *Philip A. Butler*, Stewart and Stewart, of Washington, DC, and *Edward T. Hayes*, Leake & Andersson, LLP, of New Orleans, LA.

Goldberg, Senior Judge:  Plaintiffs challenge the final results of an administrative review of an antidumping duty order on frozen warmwater shrimp from India.  *Certain Frozen Warmwater Shrimp from India*, 78 Fed. Reg. 42,492 (Dep't Commerce July 16, 2013) (final admin. review) ("*Final Results*").  During the review, the U.S. Department of Commerce ("Commerce" or "the agency") assigned mandatory respondent Apex Frozen Foods Private Ltd. ("Apex") a 3.49 percent antidumping duty rate for entries between February 1, 2011, and January 31, 2012.  *Id.* at 42,492−93.  The agency assigned the same 3.49 percent rate to non-mandatory respondents, including the other plaintiffs on appeal.  *Id.* at 42,494−96.  Commerce fixed the rates using an exceptional method to remedy "targeted dumping," which occurs when foreign exporters sell their goods in the United States for prices that differ significantly by customer, region, or time period.

Apex and others (collectively "Plaintiffs" or "Apex") claim that Commerce incorrectly applied the targeted dumping method to calculate their antidumping rate.  Apex first argues that the agency lacks authority to use the targeting dumping exception in reviews.  Next, assuming Commerce could use the targeting dumping method in reviews, Apex contends that the agency misapplied the method to its detriment.  Plaintiffs especially oppose the agency's use of "zeroing"—a hotly debated technique used to calculate antidumping rates—when deploying the targeted dumping exception.  But the court rejects these claims and sustains the *Final Results* in full.

## **BACKGROUND**

For all of its intricacy, this case concerns just one core issue: Commerce's calculation of Plaintiffs' weighted-average dumping margin.  A weighted-average dumping margin, more commonly known as an antidumping rate, is the amount of duty levied on foreign imports sold in the United States for less than their fair value.  *See* 19 U.S.C. §§ 1677(35)(B), 1675(a)(1)(B) (2006).  In this section, the court outlines the agency's formula for finding antidumping rates generally, then discusses the two variations of the formula at issue here.  The court next describes the statutory inquiry used to choose between these two variations when targeted dumping has occurred.  And finally, the court recounts how Commerce applied the antidumping formula, its two variations, and the targeted dumping inquiry to find Apex's 3.49 percent rate.

The court begins by outlining the general formula for calculating antidumping rates.  The analysis proceeds in four steps.  First, Commerce gathers a foreign exporter's normal values (or sales prices of the subject goods in the exporter's home country) and export prices (or sales prices of the subject goods in the United States).  *See id.* §§ 1677b(a)(1)(A)−(B), 1677a(a).  Second, the agency subtracts the exporter's export prices from its normal values, yielding a series of "dumping margins."  The court refers to this step as the "comparison step."  *See id.* § 1677(35)(A).  Third, Commerce weight-averages or aggregates the dumping margins into a single, composite margin.  The court calls this the "aggregation step."  *See id.* § 1677(35)(B). And fourth, the agency divides the combined margin by the good's weight-averaged export price.  *See id.*  The quotient is the foreign exporter's *ad valorem* antidumping rate.

Over the years, Commerce has used two distinct variations of this process to set antidumping rates in reviews.  Before 2012, Commerce typically relied on a version of the formula called the average-to-transactional method ("A-T").  *See Calculation of the Weighted-*

*Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings*, 77

Fed. Reg. 8101, 8101 (Dep't Commerce Feb. 14, 2012) (final modification) ("*Final Mod.*").  The

A-T method differs from other versions of the antidumping formula in its approach to averaging

at the comparison step and its treatment of margins at the aggregation step.  At the A-T

comparison step, the statute requires Commerce to subtract individual export prices from normal

values weight-averaged by month.  19 U.S.C. § 1677f-1(d)(1)(B), (d)(2).  This yields a dumping

margin for each U.S. sale of the foreign good.  The margins may be positive, and indicative of

dumping, if normal value exceeds the export price, or negative, and not indicative of dumping, if

the export price exceeds normal value.

    Next, at the A-T aggregation step, Commerce assigns each negative margin a value of

zero, then weight-averages these margins together with positive margins.  *Final Mod.* at 8101.

This method of aggregating margins, called "zeroing," is not required by statute.  Nonetheless,

Commerce claims that the ambiguous definition of "dumping margin" in 19 U.S.C.

§ 1677(35)(A) permits it to exclude negative margins from the weighted-average dumping

margin.  *See Timken Co. v. United States*, 354 F.3d 1334, 1342 (Fed. Cir. 2004).  The Federal

Circuit has approved zeroing as a reasonable way to aggregate margins under A-T.  *See id.*

    The A-T method would not always be Commerce's favored approach in reviews,

however.  Between 2007 and 2009, the World Trade Organization ("WTO") Appellate Body

ruled that the United States could not use zeroing in reviews as a default policy.[1]  In response to

the WTO rulings, Commerce decided it would no longer apply A-T with zeroing in each review

---

[1] As listed in the *Final Modification*, these decisions include Appellate Body Report, *United States—Laws, Regulations and Methodology for Calculating Dumping Margins ("Zeroing")*, WT/DS294/AB/R (May 14, 2009); Appellate Body Report, *United States—Continued Existence and Application of Zeroing Methodology*, WT/DS350/AB/R (Feb. 4, 2009); Appellate Body Report, *United States—Final Anti-Dumping Measures on Stainless Steel from Mexico*, WT/DS344/AB/R (Apr. 30, 2008); and Appellate Body Report, *United States— Measures Related to Zeroing and Sunset Reviews*, WT/DS322/AB/R (Jan. 9, 2007).  *See Final Mod.* at 8101 n.4.

proceeding.  The agency would instead apply the average-to-average method ("A-A"), a version

of the antidumping formula prescribed as the default approach in investigations, as its new

default method in reviews.  *See Final Mod.* at 8102; 19 C.F.R. § 351.414(c)(1) (2014) (requiring

A-A in reviews unless another method is more appropriate).

The A-A method differs from A-T in two ways.  First, the law requires Commerce to

subtract weight-averaged export prices from weight-averaged normal values at the A-A

comparison step.  19 U.S.C. § 1677f-1(d)(1)(A)(i).  Commerce calculates the averages by month,

producing twelve separate dumping margins.  19 C.F.R. § 351.414(d)(3).  Second, at the A-A

aggregation step, Commerce combines the twelve margins into one weighted average, including

both positive and negative margins in the equation.  *See Final Mod.* at 8102.  By computing a net

average, A-A cancels out dumped margins to the extent there are nondumped margins to offset

them.  *See U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1354−55 (Fed. Cir. 2010).  This

offsetting technique, while not required by statute, has been upheld as a reasonable way to

aggregate margins under A-A.  *Id.* at 1361−63.  Thus A-A produces rates that reflect average

dumping over the course of a review period, but not the amount of dumping effected by

individual U.S. sales.  *See U.S. Steel Corp. v. United States*, 33 CIT 984, 986, 637 F. Supp. 2d

1199, 1205 (2009).

Yet Commerce did not wholly abandon zeroing when it adopted A-A with offsets as its

default method in reviews.  As explained earlier, the law provides A-A as a default methodology

in investigations.  *See* 19 U.S.C. § 1677f-1(d)(1)(A)(i).  But the statute also allows Commerce to

use A-T as an exception to A-A to counteract "targeted dumping."  *See id.* § 1677f-1(d)(1)(B);

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316,

vol. 1, at 842−43 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4177−78 ("SAA").  Targeted

dumping occurs when exporters sell their goods in the United States at dumped prices "to particular customers or regions, while selling at higher prices to other customers or regions." SAA at 842.  When an exporter's sales are structured this way, A-A can understate dumping by measuring average dumping over the entire review period, while masking dumping from discrete targeted sales.  In contrast, A-T remedies more dumping from targeting by computing a margin for each targeted sale and by disregarding negative values when combining margins into a final rate.

When it adopted A-A as its new default method in reviews, Commerce grafted the targeted dumping exception from investigations into its review procedure.  *Final Mod.* at 8106−07.  Now, before applying A-T instead of A-A in reviews, the agency completes a two-step test outlined in statute.  The statutory inquiry (the "TD inquiry") reads as follows:

(B) Exception

The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if—

(i)     there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and

(ii)    the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii) [i.e., A-A and T-T].

19 U.S.C. § 1677f-1(d)(1)(B).[2]  To paraphrase, Commerce must first decide whether the exporter actually targeted sales by customer, region, or time period.  If the exporter targeted sales, then

---

[2] Commerce rarely uses the transaction-to-transaction or "T-T" method to calculate antidumping rates. *Final Mod.* at 8102.  The agency did not appear to consider whether T-T could not account for Apex's targeted sales in this case, but Apex does not contest this omission.

the agency must explain why A-A cannot account for dumping from those sales.  Commerce

may use A-T to calculate the exporter's rate if it provides the explanation required.

     In this case, Commerce conducted a TD inquiry, then used A-T to set Apex's rate.  At the

TD inquiry's first step, the agency found Apex had targeted some of its sales by time period and

customer.  *See* Issues & Decision Mem. ("I&D Memo") at 10, 14, PD 279 (July 10, 2013).

Commerce used the *Nails* test, a court-approved method for pinpointing targeted sales, to reach

this conclusion.  *See id.*; *Mid Continent Nail Corp. v. United States*, 34 CIT __, __, 712 F. Supp.

2d 1370, 1376−79 (2010).  No one disputes the finding that Apex targeted some of its sales

during the review period.

     Next, Commerce analyzed whether A-A could account for the dumping from Apex's

targeted transactions.  I&D Memo at 15.  The agency first found that Apex's A-A rate was 0.0

percent.  Then Commerce found that Apex's A-T rate was 3.49 percent.  After comparing the

two rates, the agency declared that the difference between the rates was "meaningful because it

crosses the de minimis threshold," and that A-A could not adequately account for Apex's

targeting.  *Id.*  Commerce then used A-T to calculate the rate, applying the method uniformly to

Apex's targeted and untargeted sales to yield a 3.49 percent result.

     In its administrative briefing, Apex contested the agency's decision to apply A-T to

calculate its antidumping rate.  *See* Apex Case Br., PD 265 (Apr. 18, 2013).  Apex's claims were

fourfold: (1) Commerce could not use the TD inquiry to decide whether to use A-T instead of A-

A, because the statute bars the TD inquiry from reviews, *id.* at 8−12; (2) the agency failed to

explain why A-A could not account for dumping from Apex's targeted sales, *id.* at 14−23; (3)

Commerce could not apply A-T to all of Apex's sales, both targeted and untargeted, to calculate

Apex's rate, *id.* at 25−26; and (4) the agency failed to explain why it zeroed when using A-T, but

not when using A-A, *id.* at 12−14.  Commerce rejected all of these claims in the *Final Results*,

and Apex appealed.  *See* Summons, ECF No. 1.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction to hear this appeal under 28 U.S.C. § 1581(c).  The court will

sustain the agency's decisions unless they are "unsupported by substantial evidence on the

record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

In light of these standards, and after carefully studying each of Apex's claims, the court

sustains Commerce on all points.  To begin, Apex has not shown that the statute barred

Commerce from conducting a TD inquiry below.  Nor has Apex proven that Commerce

mishandled the inquiry by inadequately explaining its reliance on A-T, by applying A-T to all

sales, or by failing to justify its inconsistent use of zeroing.  The court addresses each of these

topics in turn.

### I.       Commerce Had Authority to Conduct the TD Inquiry Below

Plaintiffs first claim that Commerce lacked authority to conduct a TD inquiry in the

review below.  Pls.' Mot. for J. on Agency R. 13−19, ECF No. 37 ("Pls.' Br.").  They note that

the statute expressly provides for TD inquiries in investigations, 19 U.S.C. § 1677f-1(d)(1)(B),

but is silent regarding targeting in reviews, *see id.* § 1677f-1(d)(2).  In Apex's view, this silence

reveals an intent by Congress to withhold the TD inquiry from reviews.  *See* Pls.' Br. 13−19.

The court disagrees and holds that Commerce has authority to use the TD inquiry in

reviews.  Although the statute mentions the inquiry only in the context of investigations, the

court has declared, in a swelling chorus of cases, that Commerce may apply the TD inquiry in

review proceedings.  *See DuPont Teijin Films China Ltd. v. United States*, 38 CIT __, __, 7 F.

Supp. 3d 1338, 1355−56 (2014) (sustaining TD inquiry in reviews); *JBF RAK LLC v. United States*, 38 CIT __, __, 991 F. Supp. 2d 1343, 1347−49 (2014) (same); *CP Kelco Oy v. United States*, 38 CIT __, __, 978 F. Supp. 2d 1315, 1321−24 (2014) (same); *Timken Co. v. United States*, 38 CIT __, __, 968 F. Supp. 2d 1279, 1286−87 n.7 (2014) (same).  These cases address each of the statutory arguments made in the briefs, and the court need not repeat their reasoning.

In addition to making statutory arguments, Plaintiffs vie that the legislative history of the Uruguay Round Agreements Act ("URAA") shows Congress's intent to limit the TD inquiry to investigations.  Pls.' Br. 17−18.  Like the statute, the Statement of Administrative Action mentions the inquiry in the context of investigations, but not in the context of reviews.  SAA at 843.  But the court finds Apex's argument unpersuasive.  When the SAA was drafted, Congress had no reason to consider extending the TD inquiry to reviews.  The Uruguay Round agreements, signed by participating countries in 1994, required the United States to use A-A instead of A-T as its default method in investigations.  Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, art. 2.4.2, Apr. 15, 1994, 1868 U.N.T.S. 201.  The agreements did not bar the use of A-T in reviews, however.  *See* SAA at 843.  And so, when Congress passed the URAA to comply with the agreements, it had no need to enact a method for choosing between A-A and A-T in reviews, because A-T remained the default there. *See id.* at 842−43.  Thus the legislature's silence does not manifest an intent to withhold the TD inquiry from reviews.  The silence just as readily betokens Congress's benign inattention to the matter.

## II.   Commerce Reasonably Explained Why A-A Could Not Account for Targeting

Even assuming the agency had authority to conduct a TD inquiry below, Apex claims that Commerce mishandled the inquiry.  To be clear, the Plaintiffs do not argue that Commerce

erred at the first step of the inquiry.  The agency found [[      ]] percent of Apex's U.S. sales

were targeted by customer or time period, and Apex has no direct quarrel with this finding.  *See*

Pls.' Reply Br. 5, ECF No. 53 ("Reply Br.") (calling irrelevant the question of whether targeted

dumping occurred); Apex Prelim. Results Calculations ("Prelim. Calcs.") at 3, CD 228 (Mar. 4,

2013).  But Plaintiffs do contest the agency's analysis at the second step of the TD inquiry,

calling it "arbitrary, capricious, and inconsistent."  Pls.' Br. 19.  More specifically, Apex alleges

that Commerce inadequately explained why A-A could not account for dumping from targeted

sales, or why Commerce had to apply A-T instead.

In the I&D Memo, Commerce gave its rationale for applying A-T instead of A-A.  It

began by finding the difference between Apex's antidumping rate under A-A and the rate under

A-T.  The agency explained,

> [T]he Department evaluated the difference between the weighted-average
> dumping margin calculated using the A-to-A method and the weighted-average
> dumping margin calculated using the A-to-T method.  Where there is a
> meaningful difference between the results of the A-to-A method and the A-to-T
> method, the A-to-A method would not be able to take into account the observed
> price differences, and the A-to-T method would be used to calculate the weighted-
> average margin of dumping for the respondent in question.

I&D Memo at 15.  When generating the rates, Commerce zeroed when using A-T, but not when

using A-A.  Then, after finding the antidumping rate under each method, Commerce explained

why it found A-A could not account for Apex's targeted sales:

> In this case, Apex's margin is zero using the A-to-A method and 3.49 percent
> using the A-to-T method.  The Department has concluded that for the purposes of
> this case, such a difference is meaningful because it crosses the de minimis
> threshold and warrants the application of the A-to-T method.

*Id.*  In short, Commerce chose A-T to calculate Apex's rate because A-A yielded a zero margin,

and A-T revealed dumping that A-A masked.

Apex challenges four facets of this analysis.  First, they argue that the statute required Commerce to compare A-A and A-T on an "apples-to-apples" basis, without zeroing under either method.  By zeroing under A-T but not A-A, Commerce ensured that the A-T rate would exceed the A-A rate by a considerable amount.  The agency thus perverted step two of the TD inquiry into a useless formality, and guaranteed the use of A-T to set Apex's rate.  *See* Pls.' Br. 22−24.

Second, Apex alleges that Commerce failed to explain why the difference between the A-A and A-T rates was "meaningful."  In its analysis, Commerce concluded that the difference was meaningful because it was more than *de minimis*, or 0.5 percent.  I&D Memo at 15.  Yet Plaintiffs argue that this 0.5 percent cut-off was "results-oriented" and arbitrary.  *See* Pls.' Br. 23.  As Apex interprets the test, the agency would find a difference of just 0.1 percent to be "meaningful" if the A-T rate was slightly higher than 0.5 percent, and the A-A rate was slightly lower than 0.5 percent.  Such a hair-trigger distinction ensured that Commerce would find A-A could not account for Apex's targeting.  *Id.* at 23−24.

Third, Apex contends that Commerce had to explain whether A-A with monthly averaging could remedy targeting as well as A-T.  Agency regulations hint that A-A with monthly averaging accounts for price anomalies better than A-A with annual averaging.  Consequently, Apex alleges that Commerce had to explore the merits of A-A with monthly averaging before choosing A-T to remedy Apex's targeting.  *Id.* at 24–27.

Finally, Plaintiffs argue that Commerce should have considered seasonal price changes when deciding whether to depart from A-A.  Apex suggests it was unnecessary to use the A-T remedy because involuntary variations in demand for shrimp caused the targeting.  *Id.* at 27−28.

The court considers these arguments in turn and finds that each lacks merit.

**A.      Apex Has Not Shown that the Meaningful Difference Analysis Was Unlawful**

At the outset, the court makes one point plain:  Apex does not challenge Commerce's

authority to conduct a meaningful difference analysis under § 1677f-1(d)(1)(B)(ii).  Plaintiffs

concede that significant differences between the A-A and A-T rates may prove that A-A cannot

account for targeting.  Pls.' Br. 22−23 (suggesting that statute requires Commerce to contrast

different comparison methodologies at TD inquiry's second step).

Apex's argument is more subtle than that.  As explained previously, the A-A and A-T

methods differ in two ways, one statutory, and the other discretionary.  By statute, A-A and A-T

determine margins at the comparison step using distinct approaches.  A-A compares average

export prices and normal values to set margins, but A-T compares individual export prices to

average normal values to set margins.  *See* 19 U.S.C. § 1677f-1(d)(1)(A)−(B).  The A-A and A-T

methods also differ in a second way, but this difference is not ensconced in statute.  Under A-T,

Commerce has chosen to zero negative margins at the aggregation step to remedy transaction-

specific dumping, *Final Mod.* at 8101; but under A-A, the agency offsets positive and negative

margins to find average dumping over the course of a review period, *see id.* at 8102.  Apex

argues that Commerce erred to compare rates made using A-T with zeroing and A-A without

zeroing, because the only statutory difference between the methods concerns averaging at the

comparison step.  By comparing a zeroed rate to a nonzeroed rate, Apex continues, Commerce

ensured that the A-T rate would exceed the A-A rate, thus guaranteeing the use of the A-T

remedy.  Pls.' Br. 22−23.

Yet neither the statute nor logic prohibited the agency's approach in the review below.  It

was reasonable, as a legal matter, for Commerce to compare a zeroed A-T rate to a nonzeroed A-

A rate to decide whether A-A could account for Apex's targeting.

To begin, the statute does not require that the disparity between rates stem solely from the way A-A and A-T average export prices and normal values.  In fact, § 1677f-1(d)(1)(B)(ii) does not compel Commerce to conduct a meaningful difference analysis at all.  Rather, the statute simply states that Commerce may apply A-T if "the administering authority explains why such differences [i.e., significant differences in export prices by customer, region, or time period] cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii) [i.e., A-A or T-T]."  19 U.S.C. § 1677f-1(d)(1)(B)(ii).  This language leaves the form of the explanation to the agency's discretion, and here, Commerce chose to explain the A-A method's shortcomings by contrasting Apex's A-A and A-T rates.  The statute does not dictate whether the agency needed to zero one of these rates, both of the rates, or neither.  As a consequence, Commerce could compare a zeroed A-T rate to a nonzeroed A-A rate, as long as the comparison demonstrated whether the A-A method could account for targeting.  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842−43 (1984) (giving deference where statute is ambiguous and interpretation is reasonable).

The court holds that the agency's comparison reasonably achieved the statute's purpose.  As mentioned above, Congress enacted § 1677f-1(d)(1)(B) to combat a type of dumping that is difficult to remedy.  When exporters target their sales, those sales may disproportionately affect U.S. producers who sell to particular customers or regions or in specific time periods.  *See* SAA at 842.  Nonetheless, if exporters counterweight their targeting with above-fair-value sales, then A-A, which averages export prices and offsets negative margins, could yield an understated antidumping rate.  *See Union Steel v. United States*, 713 F.3d 1101, 1108 (Fed. Cir. 2013) (holding A-A with offsets "masks individual transaction prices below normal value").  Yet A-T neither averages export prices nor offsets.  This approach ensures that the final rate reflects every

instance of dumping, even if an exporter balanced its targeting with above-fair-value sales.  *Id.* at

1108−09 (holding A-T with zeroing "reveals individual dumping").  Hence, by comparing

Apex's nonzeroed A-A rate to its zeroed A-T rate, the agency found the precise amount of

dumping—including dumping from targeted sales—that A-A masked.  Commerce could then

decide whether that dumping was great enough to merit an exceptional remedy.  This method

fulfills the statute's aim and deserves deference.  *See Chevron*, 467 U.S. at 842−43.

Apex also argues that zeroing magnifies the difference between the A-T and A-A rates,

thereby guaranteeing the finding that A-A cannot account for targeting.  Pls.' Br. 22−23.  But the

agency's approach to zeroing, in itself, did not foreordain the A-T remedy or undermine

Commerce's explanation under § 1677f-1(d)(1)(B)(ii).  It is true that A-T rates sometimes

exceed A-A rates, because A-T zeroes negative margins that would otherwise offset positive

margins under A-A.  *See, e.g.*, *Union Steel v. United States*, 36 CIT __, __, 823 F. Supp. 2d

1346, 1361−64 (2012) (appendices showing rates made with zeroing higher than rates made with

offsets).  Nonetheless, Commerce does not discard its default method whenever the A-T rate

exceeds the A-A rate.  The agency instead examines whether the rates differ meaningfully before

concluding that A-A cannot account for targeting.  I&D Memo at 15.[3]  So even if zeroing widens

the gap between the A-A and A-T rates, it does not predestine the A-T remedy or render

superfluous the explanation mandated in the statute.  The court continues, as before, to uphold

Commerce's reasonable interpretation of § 1677f-1(d)(1)(B)(ii).

Before moving to Apex's next argument, however, there is another matter the court must

confront.  Besides arguing that Commerce's explanation was *contrary to law*, Apex challenges

the conclusion that A-A could not account for targeting as *unfounded in substantial evidence*.

---

[3] Apex argues that Commerce's measure of the "meaningful difference" between the rates was arbitrary. The court considers and rejects this argument in the next section.  *See infra* Discussion II.B.

Under the statute, Commerce must explain "why *such differences* cannot be taken into account" using A-A before it applies the alternative A-T method.  19 U.S.C. § 1677f-1(d)(1)(B)(ii) (emphasis added).  The "differences" mentioned here are the significant differences in export prices "among purchasers, regions, or periods of time" noted in § 1677f-1(d)(1)(B)(i).  In other words, Commerce must explain why A-A cannot account for dumping *from targeted sales* before it deploys the A-T remedy.  But as Apex observed in its reply brief, [[   ]] percent of its sales were not targeted.  Reply Br. 10.  Apex also furnished a document at oral argument showing that [[     ]] percent of its sales were dumped but not targeted.  Prelim. Calcs. at Attach. 2; Oral Argument at 28:40.  Plaintiffs infer from these data that the difference between the 0.0 percent A-A rate and 3.49 percent A-T rate stems mainly from ordinary dumping, not targeted dumping.  *See* Reply Br. 9−10.  If this were true, then the finding that A-A could not account for Apex's targeting might be untethered from substantial evidence.  While the difference between rates would prove that A-A accounts for less dumping than A-T in general, the difference would not necessarily show that A-A cannot account for targeted dumping in particular, as required by statute.  *See* 19 U.S.C. § 1677f-1(d)(1)(B)(ii).

The court declines to consider this argument, however, because it was not exhausted before the agency.  By regulation, Apex had to present in its administrative case brief "all arguments that continue in the submitter's view to be relevant to the Secretary's . . . final results."  19 C.F.R. § 351.309(c)(2).  And by statute, if Apex failed to brief an argument before Commerce, the court need not consider the argument on appeal.  *See* 28 U.S.C. § 2637(d).  This rule gives the agency the "opportunity to correct its own mistakes," including fact-specific shortfalls in its analysis, "before it is haled into federal court."  *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992); *see also Blue Field (Sichuan) Food Indus. Co. v. United States*, 37 CIT __, __,

949 F. Supp. 2d 1311, 1324 (2013) (finding argument regarding reliability of surrogate data not

exhausted where party failed to make argument in case brief and to cite relevant evidence).

Commerce had no such opportunity to correct the alleged flaw in its meaningful

difference finding.  In its case brief, Apex remarked that "[r]ather than measuring the effect of

targeted dumping," Commerce's test "in fact measure[ed] mostly the impact of zeroing."  Apex

Case Br. 23.  But this argument was framed as a legal challenge, not as a substantial evidence

challenge.  Nowhere in the case brief did Apex cite data to show that most of the dumping in the

3.49 percent rate was untargeted.  Instead, Apex illustrated that its A-A and A-T rates would be

nearly identical if Commerce zeroed both measures.  *Id.*  While this demonstrative proved that

zeroing one rate but not the other was the main reason the rates differed, the illustration did not

reveal whether the A-T rate captured dumping mainly from untargeted sales.  Because the case

brief gave Commerce no notice of Apex's substantial evidence argument, the argument was not

exhausted.  *See Trust Chem Co. v. United States*, 35 CIT __, __, 791 F. Supp. 2d 1257, 1268

n.27 (2011).[4]

Even if Apex exhausted its substantial evidence argument, the court still would not

consider it.  The Court's rules require plaintiffs to raise any argument on appeal in their lead

briefs.  *See* USCIT Rule 81(l) ("A reply brief or memorandum must be confined to rebutting

matters contained in the brief of a responding party.").  This requirement gives defendants a

chance to respond to plaintiffs' arguments, and ensures that any matters raised are sufficiently

developed to permit the court to rule.  *See Novosteel SA v. United States*, 284 F.3d 1261,

1273−74 (Fed. Cir. 2002).  But here, Apex's briefing afforded neither of these benefits to the

defendant or the court.  In its initial brief, Apex argued (as it did below) that Commerce unfairly

---

[4] None of the traditional exceptions to the exhaustion requirement apply here.  *See Ta Chen Stainless Steel Pipe, Ltd. v. United States*, 28 CIT 627, 645 n.18, 342 F. Supp. 2d 1191, 1206 n.18 (2004) (listing exceptions).

compared zeroed to nonzeroed rates.  Pls.' Br. 22−23.  It was not until the reply brief, however,

that Apex explicitly alleged that the A-T rate reflected mostly dumping from untargeted sales.

Reply Br. 9−10.  And even then, Plaintiffs did not offer clear evidence to prove the point.

Although Apex argued that [[   ]] percent of its sales were not targeted, these data merely

implied, but did not show, that the A-T rate embraced other than targeted dumping.  *Id.*  Only at

oral argument did Apex supply record evidence to suggest that most of the dumping was not

targeted—and this over an objection that the evidence had not been cited in the briefs.  Oral

Argument 32:20.  Because Apex raised its substantial evidence argument at the eleventh hour,

the argument was waived.

Plaintiffs rejoin that their fact-specific argument was implicit in their submissions both to

Commerce and to the court.  According to Plaintiffs, their claim against the application of the A-

T method to all sales—both targeted and untargeted—makes sense only if some untargeted sales

were dumped.  *See* Pls.' Supp. Br. 6−7, ECF No. 65; *see also* Pls.' Br. 28−34.[5]  Were there no

dumping among Apex's untargeted sales, then A-A and A-T would yield the same null rate for

those sales.  This would have left Apex without an incentive to dispute the global application of

A-T.  Yet because Apex did dump some of its untargeted sales, Plaintiffs reason that A-T yielded

a higher rate than A-A for those sales; thus Apex had cause to restrict the A-T method to targeted

sales only.  Apex concludes that its argument to limit A-T to targeted sales put Commerce on

notice that some of its dumped sales were not targeted.  *Id.*

The court is not convinced.  Even if Apex's argument *hinted* that some untargeted sales

were dumped, this would not have alerted Commerce to a flaw in its meaningful difference

results.  Apex moved to limit A-T to targeted sales at the TD inquiry's remedy phase, but the

meaningful difference test comes a step earlier, when Commerce considers whether A-A can

---

[5] The court addresses the merits of this claim below.  *See infra* Discussion III.

account for targeting.  *See* Pls.' Br. 21−24 (meaningful difference argument), 28−34 (TD remedy

argument); *see also* I&D Memo at 15 (describing sequence of the TD inquiry).  The agency

would not naturally infer from an argument made at the remedy step that a conclusion made at an

earlier step was wrong.  And furthermore, even if Apex had implied its substantial evidence

challenge more overtly, Commerce need not respond to arguments that are merely implicit in the

briefing.  To exhaust the argument below and to preserve the argument on appeal, Apex had to

state its challenge in reasonably explicit terms and provide some evidence in support.  *See Nat'l*

*Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1231 (D.C. Cir. 2007) (holding agency need

not answer arguments merely implied in submissions).  Because Apex did neither of these things

until its reply brief, the court cannot consider the argument now.

Based on the record and arguments before it, the court holds that the comparison of a

zeroed A-T rate to a nonzeroed A-A rate under § 1677f-1(d)(1)(B)(ii) complies with law.

**B.       Commerce's Meaningful Difference Threshold Was Not Arbitrary**

Next, and in a similar vein, Apex challenges Commerce's evaluation of the difference

between the A-A and A-T rates.  In the I&D Memo, the agency noted that Apex's A-A rate was

0.0 percent, and that the A-T rate was 3.49 percent.  The agency then "concluded that for

purposes of this case," the difference between rates was "meaningful because it crosses the de

minimis threshold and warrants the application of the A-to-T method."  I&D Memo at 15.

Apex argues that it was arbitrary for Commerce to apply the A-T remedy simply because

the A-T rate was more than *de minimis*.  Pls.' Br. 23−24.  As Plaintiffs interpret the test,

Commerce would apply A-T if an exporter's rate were 0.45 percent under A-A and 0.55 percent

under A-T, because in this hypothetical, the A-T rate exceeds the *de minimis* threshold of 0.5

percent.  But to apply A-T based on a 0.1 percentage-point difference in rates might be

unreasonable.  Hence, in Plaintiffs' view, for Commerce to use A-T, simply because Apex's 3.49

percent rate exceeds 0.5 percent, was "arbitrary and results-oriented."  *Id.* at 23.

The court finds Commerce's reliance on the *de minimis* standard was not arbitrary, as

Apex alleges.  Defined as 0.5 percent in 19 C.F.R. § 351.106(c)(2), the *de minimis* threshold

represents the minimum weighted-average dumping margin needed to levy antidumping duties in

reviews.  That is, the agency does not impose duties at all if it finds that an exporter's rate is less

than or equal to 0.5 percent.  The threshold is small by design, because reviews aim "to

counteract as much dumping behavior" as possible.  *Union Steel*, 36 CIT at __, 823 F. Supp. 2d

at 1359.

Using this regulation as a guide, Commerce reasonably concluded that A-A could not

account for dumping from targeted sales.  When it calculated Apex's rate using A-A, Commerce

found no dumping.  I&D Memo at 15.  Had the agency relied strictly on A-A to fix Apex's rate,

§ 351.106(c)(2) would have precluded Commerce from imposing antidumping duties.  Yet when

Commerce calculated the rate using A-T, it found a rate of 3.49 percent.  *Id.*  This figure is

nearly seven times greater than the minimum threshold needed to impose duties.  The rates thus

offered a stark choice.  Commerce could fully counteract Apex's targeted dumping by applying

A-T, or it could counteract none of Apex's targeted dumping by applying A-A.  Because A-T

would yield some duties but A-A would yield none, Commerce reasonably decided that the

difference between the rates was "meaningful," and that A-A could not account for dumping

from targeted sales.  *Cf. Beijing Tianhai Indus. Co. v. United States*, 38 CIT __, __, 7 F. Supp. 3d

1318, 1331−32 (2014) (holding explanation invalid where Commerce provided no basis to

conclude that A-A could not account for targeting).[6]

---

[6] Perhaps it would be arbitrary if Commerce found a "meaningful difference" between a 0.45 percent A-A rate and a 0.55 percent A-T rate.  *See* Pls.' Br. 23.  But as the Government correctly notes, this (footnote continued)

Even so, Apex argues that this case mirrors *Kelco*, which was remanded for Commerce to explain a different, ill-defined *de minimis* test.  *See* Reply Br. 7.  In *Kelco*, Commerce examined whether plaintiff had targeted its sales under § 1677f-1(d)(1)(B)(i).  *Kelco*, 38 CIT at __, 978 F. Supp. 2d at 1319−20.  The agency found targeting, and concluded that because targeted sales comprised more than a *de minimis* share of total sales, it would consider whether A-A accounted for targeting under § 1677f-1(d)(1)(B)(ii).  *Id.*  Yet Commerce never defined how many sales must be targeted to qualify as more than *de minimis*.  The court held that it was arbitrary to omit this explanation from the analysis.  *Id.* at __, 978 F. Supp. 2d at 1327−29.

Here, Apex challenges a different test and on different grounds.  Unlike *Kelco*, which considered a *de minimis* test at the TD inquiry's first step, this case examines the use of a *de minimis* threshold at the TD inquiry's second step, § 1677f-1(d)(1)(B)(ii).  Furthermore, unlike *Kelco*'s plaintiff, Apex does not claim that Commerce failed to define the *de minimis* threshold used here.  As shown by their brief, Plaintiffs clearly understood that antidumping rates are more than *de minimis* if they exceed 0.5 percent.  *See* Pls.' Br. 23−24 (equating *de minimis* standard with 0.5 percent threshold from regulation).  Apex instead argues that Commerce could not apply A-T simply because the difference between its A-A and A-T rates was greater than 0.5 percent. *Id.*  But this argument faults Commerce for the analysis it rendered, not for analysis that it neglected to give.  *Kelco* is inapposite, and the court sustains Commerce's use of the *de minimis* threshold to decide whether A-A could account for targeted sales.

---

illustration does not mean the analysis below was similarly absurd.  Def.'s Resp. in Opp. to Pls.' R. 56.2 Mot. for J. on Agency R. 28−29, ECF No. 49.  In this case, the difference between the A-A and A-T rates was 3.49 percentage points, a disparity nearly thirty-five times greater than Apex's hypothesized 0.1 percentage point difference.  It was not arbitrary, given this difference between rates, to conclude that A-A could not account for targeting.

### C. Commerce Did Not Need to Explain the Impact of Monthly Averaging in Reviews

Plaintiffs do not only dispute Commerce's affirmative findings, however.  They also fault the agency for perceived omissions in its § 1677f-1(d)(1)(B)(ii) analysis.  Apex argues, for instance, that Commerce had to explain whether A-A with monthly averages could account for targeting before selecting the A-T remedy.  *See* Pls.' Br. 24−27.  A regulation allows Commerce to use A-A with monthly instead of annual averages if normal values and export prices differ significantly over a period of investigation or review.  19 C.F.R. § 351.414(d)(3).  To Apex, this means A-A with monthly averages might unmask "distortions and fluctuations" from targeted sales just as well as A-T.  Pls.' Br. 26.

The court rejects this argument.  By comparing Apex's A-A and A-T rates, Commerce already showed that A-A with monthly averages could not account for targeted dumping.  The agency's default method for setting antidumping rates in reviews, as mentioned before, is A-A with offsets and monthly averaging of export prices.  *Final Mod.* at 8102.  Commerce found a 0.0 percent rate when it applied this method to Apex's sales.  *See* I&D Memo at 15.  Then Commerce applied A-T, a method that neither averages export prices nor offsets negative margins, and this yielded a 3.49 percent rate.  *See id.*  The disparity between the rates demonstrated that A-A with monthly averaging accounted for none of the dumping from Apex's targeting.  *See supra* Discussion II.B.  This comparison and explanation sufficed to carry Commerce's burden under § 1677f-1(d)(1)(B)(ii).  Whether A-A with monthly averages generally captures more dumping than A-A with annual averages was irrelevant to the matter.

### D. Commerce Did Not Need to Account for Seasonality in Its Targeting Analysis

Apex next challenges another perceived omission in Commerce's § 1677f-1(d)(1)(B) analysis.  According to Plaintiffs, Commerce had to consider seasonal changes in demand for

frozen shrimp before imposing the A-T remedy.  Pls.' Br. 27−28.  In an agency hearing, Apex

noted that demand for shrimp falls in the fourth quarter of each calendar year, depressing U.S.

prices below normal levels and creating a false image of targeting.  *See* Hr'g Tr. at 19−20, PD

275 (June 17, 2013).  Plaintiffs imply that Commerce could not use A-T to remedy targeting

caused by natural moves in supply and demand, and not by intentional acts.

 The court again disagrees, because the statute does not require Commerce to decide why

sales were targeted before imposing the A-T remedy.  Two recent cases note that the statute is

silent regarding exporters' intent to target their U.S. sales.  *JBF RAK*, 38 CIT at __, 991 F. Supp.

2d at 1355; *Borusan Mannesmann Boru Sanayi Ticaret A.S. v. United States*, 38 CIT __, __, 990

F. Supp. 2d 1384, 1389 (2014).  The agency thus had discretion to examine intent and

seasonality—or not—in its § 1677f-1(d)(1)(B) analysis.  And furthermore, though it may seem

fair to impose the A-T remedy only when exporters intentionally target their sales, the court must

not lay an analytical "burden on Commerce that is not required or suggested by the statute."

*Borusan*, 38 CIT at __, 990 F. Supp. 2d at 1389 (quoting *Viraj Grp. v. United States*, 476 F.3d

1349, 1358 (Fed. Cir. 2007)).  The court would breach this rule if it forced Commerce to

consider seasonality where the law does not demand it.

 Apex also suggests that Commerce was bound to consider seasonality as a matter of

agency practice.  Pls.' Br. 27−28.  This argument fails too, because Apex has not shown that

Commerce uniformly considers seasonality in its TD inquiry.  *See Ranchers-Cattlemen Action*

*Legal Found. v. United States*, 23 CIT 861, 884−85, 74 F. Supp. 2d 1353, 1374 (1999) (holding

agency actions become binding when practice produces reasonable reliance).  Indeed, Apex cites

just one seventeen-year-old proceeding where Commerce considered seasonality, and this in the

context of determining normal values.  *See Certain Fresh Cut Flowers from Colombia*, 62 Fed.

Reg. 53,287, 53,295−97 (Dep't Commerce Oct. 14, 1997) (final admin. review).  This single

proceeding, which did not concern targeted dumping, did not form a binding practice.

Commerce did not act arbitrarily by refusing to consider seasonality below.

### III.   Commerce Reasonably Applied the A-T Remedy to All Sales

After finding targeting among Apex's sales, and after deciding that A-A could not

account for the targeting, Commerce used the A-T method to calculate Apex's antidumping rate.

In doing so, Commerce applied A-T not only to targeted sales, but also to Apex's untargeted

sales.  *See* I&D Memo at 15.  Plaintiffs claim this was error.  In their view, the statute clearly

requires Commerce to deploy A-T only against targeted sales.  Pls.' Br. 29.  Apex also contends

that the agency promised to limit A-T to targeted sales when it adopted its investigation

procedures in reviews.  *Id.* at 29−34.

Neither argument persuades.  First, the statute does not restrict the A-T method to

targeted sales once targeting is found.  It is true, as a general matter, that the agency must use A-

A to calculate exporters' antidumping rates in investigations: 19 U.S.C. § 1677f-1(d)(1)(A)

invokes the unequivocal "shall" when ordering Commerce to use A-A or T-T in ordinary cases.

But even so, if the agency identifies targeting that default methods cannot explain, the statute

permits Commerce to "determine whether *the subject merchandise* is being sold in the United

States at less than fair value" using A-T.  19 U.S.C. § 1677f-1(d)(1)(B) (emphasis added).

Notice the statute does not expressly confine A-T to targeted sales.  Instead, it permits

Commerce to apply A-T to "the subject merchandise," regardless of whether the merchandise

was sold in a pattern of targeting.  Given this ambiguous language, Commerce could apply A-T

to all sales or to targeted sales only, provided that the choice was reasonable.  *See Chevron*, 467

U.S. at 842−43.

The agency's decision to apply A-T to all sales was reasonable here.  Commerce

explained in the I&D Memo that applying A-T to all sales was "more consistent with the

Department's approach to selection of the appropriate comparison method" than applying A-T

only to targeted sales.  I&D Memo at 18.  Because Commerce applies A-A to all sales under

§ 1677f-1(d)(1)(A), the agency found it equally fair to apply A-T to all sales under § 1677f-

1(d)(1)(B).  But more importantly, Commerce noted that applying A-T to all sales

> eliminates the masked dumping by exposing 1) any implicit masking within the
> weighted-average U.S. sales price by basing the comparison on the transaction-
> specific U.S. sales price rather than the weighted-average U.S. sales price, and 2)
> any explicit masking between individual comparison results by not providing
> offsets for negative comparison results.

*Id.* at 19.  More succinctly, Commerce applied A-T across the board to reveal dumping hidden

by sales that were neither targeted nor dumped.  This approach served the statute's purpose and

warrants appropriate deference.[7]

Second, and notwithstanding any ambiguity in the statute, Apex argues that the law still

bound Commerce to limit A-T to targeted sales.  Pls.' Br. 29−34.  Pursuant to a regulation called

the "Limiting Rule," Commerce long restricted A-T to targeted sales when it used the TD

exception in investigations.  *See* 19 C.F.R. § 351.414(f)(2) (2008).  And although the agency

withdrew the Limiting Rule in 2008, *see Withdrawal of the Regulatory Provisions Governing*

*Targeted Dumping in Antidumping Duty Investigations*, 73 Fed. Reg. 74,930−31 (Dep't

---

[7] Apex notes that Commerce now applies A-T uniformly only if targeted sales comprise more than a certain fraction of the total value of an exporter's sales.  *See* Pls.' Br. 33−34 (citing *Xanthan Gum from the People's Republic of China*, 78 Fed. Reg. 33,351 (Dep't Commerce June 4, 2013) (final admin. review) and accompanying I&D Memo at cmt. 3).  This change of course does not invalidate the policy disputed here, however.  If an agency practice reasonably complies with statute, that practice is not rendered invalid simply because the agency replaces it with an equally defensible policy.  *Cf. Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (holding new policy not invalid simply because policy is inconsistent with past practice).

Apex also contends that it was "unduly punitive" to apply A-T to all sales "regardless of the amount of targeting that may have occurred."  Pls.' Br. 30; *see also Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7350 (Dep't Commerce Feb. 27, 1996) (req. for cmts.).  Yet Plaintiffs did not explain why the ratio of targeted to untargeted sales mattered until the reply brief, where Apex first argued that its A-T rate reflected mainly untargeted sales.  *See* Reply Br. 9−10.  Because Apex neither exhausted this argument below nor raised it properly on appeal, the court does not consider it.  *See supra* Discussion II.A.

Commerce Dec. 10, 2008), a series of cases later invalidated the withdrawal, *see Mid Continent Nail Corp. v. United States*, 38 CIT __, __, 999 F. Supp. 2d 1307, 1321−23 (2014); *Gold East Paper (Jiangsu) Co. v. United States*, 37 CIT __, __, 918 F. Supp. 2d 1317, 1327−28 (2013). Consequently, Apex argues that Commerce had to confine A-T to targeted sales below, because the agency adopted its investigation procedures in reviews at a time when the Limiting Rule still controlled in investigations. *See* Pls.' Br. 31−32; Reply Br. 13−14.

The court rejects these arguments. By its own terms, the Limiting Rule applies only to investigations. *See* 19 C.F.R. § 351.414(f)(1)−(2) (2008) (stating agency must limit scope of A-T remedy under paragraph (f)(1), which permits A-T in "antidumping investigation[s]"). "Commerce, like other agencies, must follow its own regulations," *Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996), but it need not extend those regulations beyond their terms.

Furthermore, although the Limiting Rule technically applied to investigations in 2012, Commerce did not believe that the Rule bound its conduct when it grafted its investigation procedures into reviews. The initial decision invalidating the Limiting Rule's withdrawal, *Gold East Paper*, was not decided until June 17, 2013, over a year after Commerce published the *Final Modification*. 37 CIT at __, 918 F. Supp. 2d at 1317; *Final Mod.* at 8101. And Apex has identified not one instance between 2012 and the *Final Results* when Commerce limited A-T to targeted sales in a review. *See* Pls.' Br. 29−34. Because it had never before recognized the Limiting Rule in reviews, Commerce was not bound to apply the Rule as a matter of agency practice. *See Ranchers-Cattlemen*, 23 CIT at 884−85, 74 F. Supp. 2d at 1374.

This holding renders moot Apex's citation to *Chang Chun Petrochemical Co. v. United States*, 37 CIT __, __, 906 F. Supp. 2d 1369, 1378−81 (2013). In *Chang Chun*, Commerce

refused to follow the Limiting Rule in an investigation, even though the agency was bound by

regulation to observe it.  The court held that Commerce could not apply A-T to all sales unless it

explained why plaintiff's case justified an exception from the Rule.  *Id.* at __, 906 F. Supp. 2d at

1380−81.  In a similar vein, Apex argues that Commerce failed to justify applying A-T

universally, for instance, by showing that segregating Apex's targeted and untargeted sales

would be unduly burdensome.  *See* Pls.' Br. 32−33; *see also Chang Chun Petrochem. Co. v.

United States*, 37 CIT __, __, 953 F. Supp. 2d 1300, 1305 (2013) (approving limitation of A-T to

targeted sales where Commerce found it could segregate targeted and untargeted sales).  Yet

here, the Limiting Rule never controlled Commerce's conduct in reviews.  Commerce had no

need to explain why Apex's case merited an exception from the Limiting Rule, because the

agency was not bound to observe the Rule in the first place.

## IV.     Commerce's Explanation of Zeroing Accorded with Law

Finally, Plaintiffs allege that Commerce failed to justify its approach to zeroing when

calculating Apex's rate.  As the court discussed previously, Commerce does not use zeroing to

aggregate margins under A-A, the default method in reviews.  The agency does use zeroing,

however, when applying the A-T method to remedy targeting.  Plaintiffs allege that Commerce

had to explain why it interprets the statute to allow zeroing when targeted dumping is a concern,

but not otherwise.  In their view, Commerce's explanation on the record inadequately addressed

the inconsistency.  *See* Pls.' Br. 34−39.[8]

The agency's rationale for its zeroing policy withstands this assault.  As mentioned

before, the statute does not say whether Commerce must zero or provide offsets at the

---

[8] This appears to be an issue of first impression.  Though courts have addressed whether Commerce may zero inconsistently in investigations and reviews, none have decided whether the agency may apply zeroing disparately in a single proceeding.  *See Beijing Tianhai*, 38 CIT at __, 7 F. Supp. 3d at 1337 (reserving decision on zeroing in TD context); *Mid Continent Nail*, 38 CIT at __, 999 F. Supp. 2d at 1320, 1323−24 (same).

aggregation step of the antidumping formula.  Accordingly, in its discretion, Commerce has long

zeroed when using A-T, and with the Federal Circuit's blessing.  *See Timken*, 354 F.3d at 1342.

Commerce has also provided offsets instead of zeroing when using A-A, and again with the

Federal Circuit's approval.  *See U.S. Steel*, 621 F.3d at 1361−62.  Nevertheless, the agency

cannot apply zeroing inconsistently without justification.  In *Dongbu Steel Co. v. United States*,

635 F.3d 1363, 1371−73 (Fed. Cir. 2011), the Federal Circuit found that Commerce behaved

arbitrarily when it failed to explain why it used A-T with zeroing in reviews and A-A with

offsets in investigations.  The appellate court reached the same result in *JTEKT Corp. v. United*

*States*, 642 F.3d 1378, 1384−85 (Fed. Cir. 2011).  Both cases remanded so Commerce could

provide the explanation required, if such an explanation were possible.

    In *Union Steel*, 713 F.3d at 1101, Commerce provided the justification the Federal Circuit

sought.  *Union Steel*, like its predecessors, confronted whether the agency adequately defended

its decision to use zeroing in reviews but not investigations.  Commerce gave three reasons why

it interpreted the statute's silence differently in each proceeding.  First, Commerce explained that

it zeroed in reviews but not investigations because the two proceedings served different

purposes.  Investigations assess whether to impose antidumping orders in the first place, thus

justifying the use of broad averages and offsets under A-A; reviews, by contrast, set "the final

rates to be used for actual assessment," requiring greater accuracy and necessitating individual

dumping margins and zeroing.  *Union Steel*, 36 CIT at __, 823 F. Supp. 2d at 1359.  Second,

Commerce explained that A-A and A-T average normal values and export prices differently,

justifying zeroing under A-T but not A-A.  *Union Steel*, 713 F.3d at 1108−09.  And last,

Commerce offered that it had abandoned zeroing in investigations, but not reviews, pursuant to

WTO law.  *Id.* at 1109−10.  The Federal Circuit found these reasons sufficient to sustain the

agency's proceeding-specific approach to zeroing.  *Id.* at 1109−10.

        A three-part rationale similar to that in *Union Steel* explains why Commerce zeroes to

remedy targeting, but not otherwise.  In the I&D Memo, the agency said that it uses zeroing

inconsistently to combat different types of dumping.  *See* I&D Memo at 13.  In general,

Commerce relies on A-A without zeroing in reviews to remedy ordinary dumping.  *See Final*

*Mod.* at 8104.  But when exporters engage in targeted dumping, A-A without zeroing may mask

less-than-fair-value sales by averaging export prices at the comparison step and offsetting at the

aggregation step.  Commerce expanded on this concept when discussing why it applied A-T to

all of Apex's sales at the remedy phase:

> The [Federal Circuit] has explained that "masked" dumping occurs . . . when
> "profitable sales serve to 'mask' sales at less than fair value."  An Indian exporter,
> who competes with U.S. producers, could gain U.S. customers either by dumping
> to all customers at once or by dumping to a specific customer (or customers).  In
> the latter scenario, the Indian exporter uses "profitable" (i.e., non-dumped) sales
> to mask its dumped sales to a particular customer by compensating for its dumped
> sales to one customer with its profitable sales to other customers.

I&D Memo at 19; *see also* Def.'s Resp. in Opp. to Pls.' R. 56.2 Mot. for J. on Agency R. 31−32,

ECF No. 49.  In other words, targeted dumping poses a challenge that ordinary dumping does

not:  It disproportionately impacts specific segments of the market (i.e., regions, customers, or

time periods), but hides the effect with above-fair-value sales to other segments.  To remedy this

problem, Commerce applies A-T with zeroing instead of A-A, which exposes "any implicit

masking . . . by basing the comparison [of normal values and export prices] on the transaction-

specific U.S. sales price rather than the weighted-average U.S. sales price."  I&D Memo at 19.

A-T also reveals "any explicit masking between individual comparison results by not providing

offsets for negative comparison results."  *Id.*; *see also U.S. Steel*, 621 F.3d at 1363 (recognizing

use of zeroing for "alleviating concerns of targeted or masked dumping").  In light of the

differences between targeted and ordinary dumping, the court finds it was reasonable to deploy

zeroing to address one type of dumping but not the other.

Commerce did not rest its explanation on these grounds alone, however.  It also noted

that differences inherent in the A-T and A-A methods justify zeroing under one method but not

the other.  *See* I&D Memo at 13.  As noted in *Union Steel*, the statute requires Commerce to

compare average export prices to average normal values when creating dumping margins under

A-A.  By averaging export prices, A-A implicitly offsets low export prices against high export

prices.  Thus it is also appropriate to offset positive and negative values when combining A-A

margins into a single rate.  *Union Steel*, 713 F.3d at 1108−09.  Under A-T, by contrast, the

agency creates margins by comparing average normal values to individual transaction prices.

This process yields a dumping margin for each sale of subject merchandise during a review

period.  By refusing to offset positive and negative values when aggregating margins, A-T

ensures a remedy for each dumped transaction.  *See id.*  In sum, the agency's approach to zeroing

under A-A and A-T is reasonable because "the comparison methodologies compute dumping

margins in different ways and are used for different reasons."  *Id.* at 1109.

Third and finally, Commerce justified its approach to zeroing as a prudent response to

WTO rulings.  I&D Memo at 13−14.  In the 2012 *Final Modification*, the agency abandoned A-T

with zeroing as its default method in reviews in favor of A-A without zeroing.  Commerce made

the change pursuant to several WTO Appellate Body decisions, which found that zeroing as a

default in reviews was inconsistent with international law.  *See Final Mod.* at 8101 n.4.  Yet

these decisions did not outlaw zeroing entirely.  Although it condemned zeroing as a default

approach in review proceedings, the WTO did not forbid zeroing for use in exceptional

circumstances.  *See id.* at 8106−07.  As a result, Commerce chose to continue zeroing on a case-by-case basis, and as needed to remedy targeted dumping.  I&D Memo at 13−14.  The court finds it was reasonable, and within Commerce's discretion, to discontinue zeroing only to the extent required by WTO law.  *See Union Steel*, 713 F.3d at 1110.

## <u>CONCLUSION</u>

After carefully considering the parties' briefs and the administrative record, the court sustains Commerce's *Final Results* in all respects.  The court will enter judgment accordingly.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated:  December 1, 2014
New York, New York